IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALISSA JAMISON and MANDY BRANTLEY, on behalf of themselves individually and all others similarly situated,<br><br>Plaintiffs,<br><br>SUMMER INFANT (USA), Inc. a Delaware Corporation, and TOYS "R" US d/b/a BABIES "R" US, a Delaware Corporation,<br><br>Defendants, | Case No. 09-cv-07513<br><br>The Honorable Judge Castillo<br><br>CLASS ACTION<br>JURY DEMANDED |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Toys "R" Us ("TRU") and Summer Infant have represented to consumers that the Summer Infant video baby monitors ("Video Monitors") would provide "peace of mind".[1] In stark contrast, Defendants chose to *omit* from consumers specific material information about the products at the time of purchase. This information would have informed purchasers that the Video Monitors were unencrypted and allowed third parties and even criminals, to see and hear things inside the privacy of the purchasers' homes, such as breastfeeding, diaper changes, and caregivers caring for babies at all hours of the night, potentially, in various stages of undress.

In their Motion to Dismiss the Second Amended Complaint ("Motion"), Defendants do not deny that the Video Monitors broadcast unencrypted signals. Instead, they argue that Plaintiffs' complaint should be dismissed because: (1) Plaintiffs have little or no connection to Illinois for purposes of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"); (2) the ICFA is preempted by the FCC rules regarding certification of radio frequency

---

[1] Since the Amended Complaint was filed, Summer Infant has changed the statement on some of its packaging from "See and hear baby for peace of mind" to "See and hear baby from anywhere in your home".

1

devices; (3) Plaintiffs have not alleged a claim for common law negligence; (4) Plaintiffs cannot state a claim for unjust enrichment; and (5) Plaintiffs cannot state a claim for breach of implied warranty under the Magnuson-Moss Act. As explained below, Defendants' arguments fail and the Motion should be denied it its entirety.

### A. DEFENDANTS ARE LIABLE UNDER THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT.

Defendants ignore the plain allegations of the complaint, which state that: (1) Plaintiff Jamison purchased and used a Video Monitor in Illinois; (2) Defendants advertised and sold the monitors in Illinois; and (3) Plaintiffs seek relief under the ICFA and "materially similar consumer protection statutes." Accordingly, Defendants' arguments must be rejected.

#### 1. Defendants Are Liable Under the ICFA.

Without arguing that this Court does not have personal jurisdiction over them, Defendants argue that they cannot be liable under the ICFA because the conduct alleged has little connection to Illinois. Defendants' argument is frivolous; Jamison alleges that she purchased a Video Monitor at one of Defendant Toys-R-Us' Illinois stores and that she used two Video Monitors in Illinois. Second Amended Complaint ("Compl.") ¶ 31. Thus, Defendants are disingenuous when they argue that there are insufficient contacts for them to be found liable under Illinois law as a result.[2]

#### 2. Defendants Violated the ICFA with Respect to Jamison.

Jamison is an Illinois resident who purchased Video Monitor in Illinois and used Video Monitors in Illinois. Compl. ¶ 31. Thus, she is a consumer with standing to sue under the Act. 815 ILCS 505/1(e). The ICFA applies to out-of-state defendants where the "trade or commerce

---

[2] In order to be liable under the ICFA, a defendant need not even have a brick and mortar store in Illinois. Courts routinely find liability when a defendant "design[s] the product for the forum state, advertis[es] in the forum state, provid[es] advice to customers in the forum state, [and/or] market[s] the product through a distributor in the forum state." *Zazove v. Pelikan, Inc., et al.*, 326 Ill. App. 3d 798, 804 (1st Dist. 2001). All that need be alleged is that there was conduct directed at Illinois residents or that affected Illinois residents. *Id.* at 806 (citations omitted).

directly or indirectly [affects] the people of [Illinois]." 815 ILCS 505/1(f). Here, Defendants packaged, marketed, and sold the Video Monitors in Illinois to Illinois residents such as Jamison. Therefore, there are sufficient connections to Illinois for Defendants to be held liable under the ICFA. *See, e.g., Zazove* at 798.

### 3. Defendants Violated the South Carolina Unfair Trade Practices Act with Respect to Brantley.

Defendants' argument as to Brantley is similarly baseless because Brantley does not allege that she has a claim under the ICFA. Plaintiffs' complaint states that Defendants have violated not only the ICFA, but also "those other state consumer protection statutes that are in all material respects similar to it". Compl. ¶ 57. As Defendants violated the South Carolina Unfair Trade Practices Act ("SCUPTA"), a law similar to the ICFA, Brantley's claim may not be dismissed.[3]

Plaintiffs have sufficiently alleged that Defendants violated SCUPTA because they allege that Brantley would not have purchased the Video Monitor had Defendants not omitted the material fact that use of the product would allow strangers to view and hear her family while in the privacy of their home. Compl. ¶ 46. The ICFA and the SCUPTA are materially similar, and both statutes expressly look to the Federal Trade Commission's and the federal courts' interpretations of the FTC Act for guidance on their construction. *See* 815 ILCS 505/2; S.C. Code §39-5-20(b). The ICFA states that "omission of any material fact ... in the conduct of trade or commerce" is unlawful. 815 ILCS 505/2. Material omissions that are likely to mislead consumers are also unlawful under the SCUPTA. S.C. Code §39-5-20(a); *FTC v. Pacific First Benefit, LLC*, 472 F. Supp.2d 974, 979 (N.D. Ill. 2007).

---

[3] Under SCUPTA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. Code. §39-5-20.

3

## B. PLAINTIFFS SUFFICIENTLY STATE THEIR CLAIMS UNDER THE ICFA AND OTHER MATERIALLY SIMILAR CONSUMER PROTECTION STATUTES

### 1. Federal Labeling Requirements Do Not Preempt the ICFA Claim.

Defendants assert that the consumer fraud claim regarding Defendants' omissions and representations on the outside packaging of the Video Monitor is preempted by Part 15 of the FCC rules, and specifically, 47 C.F.R. § 15.19(a), which states:

> [A] device subject to certification, or verification, shall be labeled as follows: ... This device complies with part 15 of the FCC Rules. Operation is subject to the following two conditions: (1) This device may not cause harmful interference, and (2) this device must accept any interference received, including interference that may cause undesired operation.

The reason for requiring products to be authorized by and labeled in accordance with the FCC regulations is to ensure that the device will not cause harmful interference[4] with other radio receptors.[5]

However, Plaintiffs have not alleged that the Video Monitors transmit signals that interfere with radio transmissions or that they do not accept interference. Rather, Plaintiffs allege that Defendants deceptively omitted material facts about the product in the outside packaging of the Video Monitor.[6] As such, Defendants' alleged compliance with the FCC's certification and labeling regulations is irrelevant because compliance does not immunize

---

[4] "Harmful Interference" is defined as "any emission, radiation or induction that endangers the functioning of a radio navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radio communications service operating in accordance with this chapter." 47 C.F.R. § 15.3(m).

[5] To this end, 47 C.F.R. § 15.1(a) states that it sets out regulations for the "technical specifications administrative requirements and other conditions relating to the marketing of part 15 devices." This does not mean that it controls all aspects of marketing; only that a device must meet certain specifications in order to be marketed in the first instance. *See* FCC, Office of Engineering and Technology Bulletin No. 63, *Understanding the FCC Regulations For Low-Power, Non-Licensed Transmitters*, at p.2 (Oct. 1993), attached as Exhibit A. (The device is "required to have FCC authorization before it can legally be marketed in the [U.S.].") *See also* 47 C.F.R. § 2.803 ("No person shall sell or lease, or offer for sale or lease (including advertising for sale or lease), or import, ship, or distribute for the purpose of selling or leasing or offering for sale or lease, any radio frequency device" unless it complies with all technical standards of certification, authorization, and verification rules of the FCC.)

[6] *See St. Joseph Hospital v. Corbetta Construction Co, Inc.*, 21 Ill. App. 3d 925, 953 (1st Dist. 1974) ("It is well established that a statement which is technically true as far as it goes may nevertheless be fraudulent where it omits material facts because "a half-truth is sometimes more misleading than an outright lie.")

4

manufacturers and sellers from consumer fraud. Indeed, taking Defendants' argument to its logical conclusion would mean that if Defendants claimed on the Video Monitor's packaging that use of the monitor would cause babies to become smarter, consumers would have no recourse under their state consumer protection statutes (if this representation were not in fact true) simply because Defendants complied with the FCC certification and labeling requirements.

### a. Defendants' preemption argument is a red herring and has been rejected by the Northern District of Illinois.

The Northern District of Illinois has rejected the very argument Defendants make regarding preemption in a virtually identical scenario regarding FDA regulations. In *Zapka v. The Coca Cola Company*, the plaintiff brought suit under the ICFA claiming that Diet Coke contained saccharin even though it was represented to only contain Nutrasweet. 2001 WL 1558276 at *4 (N.D. Ill. Dec. 5, 2001).[7] Coca-Cola argued that because it listed saccharin as an ingredient on the label, it was shielded from liability because it complied with federal labeling laws. *Id.* at 12-14. The Court disagreed and held that, "while the FDA has specialized expertise in the branding and labeling of food, it does not have specialized expertise in the marketing and advertising of food or drinks." *Id.* at *6.[8]

Similarly, the FCC has no specialized expertise in the representations made on product packaging, and its requirements do not regulate such representations or omissions. Instead, compliance with the FCC regulations is the price of entry into the marketplace, not a shield from liability for unfairly operating in that marketplace.

---

[7] Attached as Exhibit C are the unpublished opinions cited in this brief.

[8] *See also Gershengorin v. Vienna Beef, Ltd.*, 2007 WL 2840476 at *3 (N.D. Ill. Sept. 28, 2007) ("The FMIA does not preempt regulation of signage separate from the marking or labeling on meat packaging itself.")

### b. The savings clause forecloses preemption and there is no conflict preemption between state and federal law.

The U.S. Supreme Court has held that there is a presumption against preemption. *See, e.g., California v. ARC American Corp.*, 490 U.S. 93, 101 (1989) (internal citations omitted). Defendants bear the burden of proving preemption, and have not met that burden here. *Village of Depue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008).

At the outset, Defendants' preemption argument is completely foreclosed by the existence of a savings clause in the Communications Act. 47 U.S.C. § 414. "This 'savings clause' expressly preserves causes of action for breaches of duties that do not exist under the Act." *Weinberg v. Sprint Corp.*, 165 F.R.D. 431, 439 (D.N.J. 1996) (citations omitted). Further, "the inclusion of such a clause appears to be inconsistent with a Congressional intent to completely preempt state law claims not addressed through the Act." *Id. See also American Inmate Phone Systems, Inc. v. US Sprint Comm.*, 787 F. Supp. 852, 856 (N.D. Ill. 1992) (Communications Act did not completely preempt claims for violations of the ICFA); *see also In re Long Distance Telecom. Lit.*, 831 F.2d 627, 633-34 (6th Cir. 1987) (Communications Act did not preempt state law claims for failing to disclose material practices).

Defendants also argue that there is conflict preemption, claiming that "[a]llowing Plaintiff's ICFA claim to proceed would frustrate the federal objective to allow the FCC to create standards for . . . Video Monitors." (Mot. at 5.) Conflict preemption will only be found where "'compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (internal citations omitted).

6

First, the ICFA's and other states' materially similar consumer protection statutes' prohibitions on unfair and deceptive representations do not stand as an obstacle to the accomplishment of the FCC's goals. *See Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 431-32 (1963) (FCC regulations on technical licensing requirements did not preempt state laws about representations in marketing because the state laws were not "an obstacle to the full effectiveness of the federal statute"); *Wyeth*, 129 S. Ct. at 1199 (state law failure-to-warn claims did not hinder and were not preempted by federal drug labeling requirements); *Kellerman v. MCI Telecommunications Corp.*, 112 Ill. 2d 428, 440-44 (1986).

Second, the purposes of the FCC's regulations are not frustrated by holding Defendants liable for not disclosing the material fact of the unencrypted signal. The Communications Act of 1934 was enacted "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels . . . by persons for limited periods of time, under licenses granted by Federal authority." 47 U.S.C. § 301. In 47 U.S.C. § 302(a)(1), Congress authorized the FCC to "make reasonable regulations ... governing the interference potential of devices which in their operation are capable of emitting radio frequency energy[.]"

The Chapter 15 Regulations at issue simply set out the conditions "under which an intentional, unintentional, or incidental radiator may be operated without an individual license." 47 C.F.R. § 15.1(a). Intentional radiators must be licensed by the FCC "prior to marketing." 47 C.F.R. § 15.201. The purpose of Chapter 15 is solely to "help ensure that Part 15 transmitters comply with the Commission's technical standards and, thus, are capable of being operated with little potential for causing interference to authorized radio communications." Exhibit A, at p. 2.[9]

---

[9] Such a limited purpose is evident because, if the transmitter does cause "interference to authorized radio communications, even if [it] complies with all of the technical standards and equipment authorization requirements in the FCC rules, then its operator will be required to cease operation" until that interference is corrected. *Id.*

7

Thus, the FCC regulations relate to radio communication interference, not deceptive representations relating to a product -- the province of state law.

Finally, compliance with both the FCC's regulations and the ICFA (and other materially similar consumer protection statutes) is not impossible. The federal regulations require the monitors to have two labels attached. Exhibit A at pp. 3-4. As it is neither inconsistent nor impossible for the monitors to bear the labels while simultaneously disclosing material facts in the product packaging, there is no conflict.

### 2. Section 10b Of The Consumer Fraud Act Does Not Bar Plaintiffs' Claims.

Defendants also contend that the ICFA exempts practices "which are permitted by other laws." (Mot. at 5.) Yet, liability is "barred by 10b(1) only if the action or transaction is specifically authorized by laws administered by the regulatory body." *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 241 (2005), *quoting* 815 ILCS 505/10(b). Plaintiffs' claim is that Defendants failed to disclose a material fact. The FCC regulations do not specifically authorize omissions on a product's packaging, nor do they even address such issues.[10] Accordingly, Section 10b does not apply, as "mere compliance with applicable federal regulations is not necessarily a shield against liability under the Consumer Fraud Act." *Price*, at 247.

### 3. There Is No Requirement To Plead A Product "Malfunction" to State A Claim For Deception Under The ICFA.

Defendants next contend that Plaintiffs cannot state a claim under the ICFA because they did not allege that a product malfunction caused their damage. (Mot. at 7.) Defendants' understanding of the Act is incorrect under Illinois law, because omissions alone are actionable under the ICFA. *Pappas v. Pella Corp.*, 363 Ill. App. 3d 795, 802 (1st Dist. 2006) (holding that, while a product liability claim requires an allegation that a product is defective or unreasonably

---

[10] *See, e.g., Zapka*, 2001 WL 1558276 at *5 ("Compliance with the labeling and notification requirements of the FFDCA cannot exempt Coca-Cola from liability pursuant to section 10b of the Consumer Fraud Act because the FFDCA does not 'specifically authorize' the marketing practices of which Zapka complains.").

8

dangerous, ICFA claims do not.). For an ICFA claim based on an omission, plaintiff must only allege that there was an omission of a material fact in commerce which would have caused the buyer to act differently if it had known of the omitted information. *Id.*[11]

Paragraph 72 of the Second Amended Complaint alleges that "Plaintiff and the Class members were damaged by the cumulative and indivisible nature of Defendants' conduct ... [and that] Defendants could not have sold the Video Monitors at the price charged if consumers had been made aware with warnings on the box that the Video Monitors would broadcast the consumers' private conversations and conduct outside of the secure confines of the consumers' homes." Paragraph 73 alleges that due to Defendants' failure to disclose, Plaintiffs and the Class members have been damaged in that they would not have paid the selling price, but for the wrongful conduct.

In determining whether a plaintiff has alleged actual damages, the relevant inquiry is whether the harm would have occurred absent the Defendants' conduct. *Evans v. Shannon*, 201 Ill. 2d 424, 434 (2002); *Pappas*, 363 Ill. App. 3d at 802, 805 (holding it sufficient under the ICFA for plaintiff to allege he would not have purchased the product had he known of the material fact allegedly omitted). Here, Plaintiffs have alleged actual damage in the form of amounts paid for the monitor, and that such damages were proximately caused by Defendants' conduct, as Plaintiffs would not have purchased the products at issue had Defendants disclosed the Video Monitors' true broadcasting capabilities.

### C. PLAINTIFFS SUFFICIENTLY STATE A CLAIM FOR NEGLIGENCE.

Defendants assert that Plaintiffs have not properly pled a negligence claim. As pled, Defendants had a duty to not omit facts that would be material to the decision to purchase the

---

[11] The case Defendants cite in support of their argument, *Yu v. Int'l Bus. Machines, Corp.*, is inapposite, as the court there found that the plaintiff failed to allege actual injury because he only alleged that the problem with the product "*may* cause potential harm." 314 Ill. App. 3d 892, 897 (1st Dist. 2000) (emphasis added). The claim was not dismissed based on a failure to allege the product malfunctioned; but that it had yet to cause plaintiff an injury.

products in question. Compl., at ¶¶ 92-94. Defendants breached that duty, which proximately caused the harm alleged -- (1) that Plaintiffs could not make a fully informed purchase decision; (2) that their privacy was compromised; and (3) Plaintiffs' suffered damage, including emotional distress.

Defendants also argue that Plaintiffs' negligence claim must be dismissed because they failed to state claims for invasion of privacy and emotional distress. (MTD at 11, 13, 14.) This argument is incongruous. First, Count IV is a claim for negligence, not invasion of privacy or emotional distress and, as stated above, Plaintiffs have pled the elements of a negligence claim. Second, the allegations regarding the compromise of plaintiff's privacy and the emotional distress suffered do not purport to state distinct claims for relief; instead they describe Plaintiffs' injury caused by Defendants' negligent omission of material facts. *See Holley v. Gurnee Volkswagen & Oldsmobile, Inc.*, 2001 WL 243191 at *2 (N.D. Ill. Jan. 4, 2001) (holding that plaintiff may proceed with a negligence claim that seeks relief for losses, such as "losses for inconvenience, emotional distress, and injury to reputation") (internal citations omitted).

Further, the economic loss doctrine does not bar Plaintiffs' claims because Plaintiffs' request for relief is not limited to economic damages. *Martin v. Wal-Mart Stores, Inc.*, 2007 WL 3231414 at *4 (N.D. Ill. Oct. 26, 2007) (refusing to dismiss negligence claim under the economic loss doctrine because plaintiff sought to recover for the emotional distress she suffered as a result of Wal-Mart's sale of an MP3 player filled with pornographic images ); *see also Holley* at *2. Plaintiffs seek damages for their injuries in the form of: (1) the distress they suffered from learning "that their families had been watched within their homes without their knowledge or consent" when using the Video Monitor (Compl. ¶ 96(b)); and (2) the threat of having their images unknowingly broadcast to third parties. Thus, the economic loss doctrine does not bar the negligence claim.

### D.     PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT.

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental policies of justice, equity, and good conscience." *Lakeshore Decaro v. M. Felix, Inc.*, 371 Ill. App.3d 1103, 1109 (1st Dist. 2007). Here, Plaintiffs have alleged that Defendants were unjustly enriched by retaining payments for Video Monitors that were excessive because the omissions at issue would have materially altered consumers' decision to either make the purchase or pay the amount they paid for the product.

Defendants argue that they did not act unjustly because (1) the product complied with FCC labeling requirements and (2) the product manual informed consumers that the airwaves used by the monitors were public. The first argument has no merit because, as explained above, compliance with the FCC labeling requirements does not shield Defendants from deceptive business practices and consumer fraud claims. The second argument is irrelevant at the pleading stage because Plaintiffs assert that Defendants unjustly withheld material information about the product *prior* to the sale. Thus, the inclusion of the instruction manual – which was contained in the sealed product box -- does not negate Plaintiffs' claim. *See, e.g., Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100-01 (2006) (finding that warranty disclaimer contained in the vehicle's owner manual, which was in the car's glove compartment, was unenforceable because plaintiff did not have access to it prior to purchase).

### E.     PLAINTIFFS STATE A CLAIM FOR BREACH OF IMPLIED WARRANTY.

Defendants contend that Count II should be dismissed as to both Defendants because the Video Monitors were fit for their ordinary purpose, and, as to Summer Infant, because it was not in privity with Plaintiffs. Mot. at 9-10. As set forth below, these arguments also fail.

11

### 1. The Video Monitors Were Not Fit For Their Ordinary Purposes.

Defendants erroneously claim that the Video Monitors were "fit for [their] ordinary purpose" and thus, merchantable as a matter of law. Under the Uniform Commercial Code, the definition of "merchantability" requires that goods must both: (1) pass without objection in the trade under the contract description; and (2) be fit for the ordinary purposes for which such goods are used. *See* 810 ILCS 5/2-314.

In this case, the Video Monitor's ordinary purpose was to enable caregivers to safely monitor children; not permit strangers to hear and view them or the conduct within the home. *See* Compl. at ¶¶ 78, 81. Moreover, it cannot be said that the unintended consequence of the monitor's function – to broadcast the sights and sounds of the home to third parties – would not meet with objection, as contemplated by § 2-314. In fact, a spate of recent television coverage about the monitors patently demonstrates that the broadcast capabilities *do* meet with objection.[12]

Even though the monitor performed one of its intended functions – monitoring -- it did not do so safely, a valid basis for challenging the merchantability of the product. A car that drives, but only in a straight line, still drives -- just not safely. Further, under § 2-315, where the seller has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.[13] These products were neither fit for their ordinary purpose, nor merchantable.

---

[12] *See, e.g.,* http://www.nbcbayarea.com/news/local-beat/Baby_Monitor_as_a_Spy_Tool_Bay_Area-111634294.html ("You might be surprised what we discovered you could see after putting a baby monitor on a car dashboard."); http://www.nbcnewyork.com/station/as-seen-on/Baby_Watch_New_York-109987899.html; http://abcnews.go.com/Technology/video/danger-of-baby-monitors-11984972; http://www.nbc.com/news-sports/today-show/strangers-can-snoop-with-baby-monitors/.

[13] "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business." 810 ILCS 5/2-315 cmt. 2. As such, an even greater degree of care, privacy, and security would naturally be expected with these products.

## 2. There Is Privity With Summer Infant By Virtue Of Its Written Warranty.

Under Magnuson-Moss, "No supplier may disclaim or modify…any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product…". 15 U.S.C. § 2308(a). Summer Infant, a "supplier" under 15 U.S.C. § 2301(4)), gave an express written warranty to purchasers of the Video Monitor.[14]

Summer Infant also directs consumers to contact Summer Infant *directly* – not TRU – with any questions or concerns, and thanks customers for buying the Video Monitors "from Summer Infant." *See* Compl., Exhibit B. In reliance on this, Brantley contacted Summer Infant directly upon learning that her Video Monitor was broadcasting the private contents of her home to others. *See* Compl. ¶¶ 43-45. Furthermore, on its recently revised website, Summer Infant now includes information about the issues raised in this case in one of its "Frequently Asked Questions".[15] This direct communication with purchasers (and potential class members) who are faced with the very issues raised in this case further supports that Summer Infant is in privity with the Plaintiffs.

Despite the existence of its written warranty, Summer Infant relies on case law interpreting the Seventh Circuit's decision in *Voelker v. Porsche Cars North America, Inc.*, 353

---

[14] The warranty, attached as Exhibit B to the Complaint, states among other things: "Summer Infant, Inc. will repair or replace (at our option) your unit free of charge for 12 months from the date of purchase if the unit is defective in workmanship or materials. To claim your repair/replacement, the product must be returned to Summer Infant along with a copy of the original purchase receipt."

[15] The FAQ in question says: "**I turned on my monitor the other day, and saw someone else's baby on the screen. Is the monitor defective? What are my options at this point?**" The response: "Since the monitor runs on public airwaves, if there is another monitor on the same frequency within the same range, this is something that can happen unfortunately … I would suggest returning it to the store for a refund. If returning it to the store is not possible, we have two options if your monitor is, in fact, under the one year warranty. We can send you out a prepaid shipping label to get your product back from you, and then swap it out for other items of equal value. Or, if you are willing to pay the difference, we can offer an upgrade to a different monitor on a higher frequency…." http://www.summerinfant.com/Help-Center/FAQ-s.aspx?page=4.

F.3d 516 (7th Cir. 2003), to try to escape liability for an implied warranty breach. *Voelker* states that under Illinois law, "privity of contract is a prerequisite to recover economic damages for breach of implied warranty," and cites the Illinois Supreme Court case of *Rothe v. Maloney Cadillac, Inc.*, 119 Ill. 2d 288 (1988), in support of this proposition. *Voelker*, 353 F.3d at 525.

In *Rothe* and its predecessor, *Szajna v. General Motors Corporation*, 115 Ill. 2d 294 (1986), the Illinois Supreme Court found that, when a manufacturer gives an express warranty with a product, it creates privity between that manufacturer and the ultimate purchaser. *Rothe*, 119 Ill. 2d at 294. When the Seventh Circuit reviewed the Illinois Supreme Court cases in *Voelker*, it was silent regarding *Rothe*'s express holding that privity between the consumer and the manufacturer exists where a written warranty is provided. This might have been because it was "undisputed that Voelker lacks privity of contract with Porsche." *Voelker*, 353 F.3d at 525. In this case, however, the alleged lack of privity is factually disputed, which sets it apart from *Voelker*.[16] In fact, Plaintiffs attached the express warranty to the Complaint, and pled facts showing reliance and compliance with that warranty.[17] When a retailer's sale and a manufacturer's warranty are closely linked, in time and subject matter, they form a single contract for privity purposes.

---

[16] Plaintiffs contend (and preserve for appeal) that under a plain reading of Magnuson-Moss, Summer Infant's express warranty provides the nexus for an implied warranty claim. The Act defines a "supplier" as someone who makes products directly **or indirectly** available to consumers. *See* 15 U.S.C. § 2301(4) (emphasis added). It further defines a "warrantor" as a supplier "who gives or offers to give a written warranty." 15 U.S.C. § 2301(5). The Act prohibits parties like Summer Infant who give express warranties from disclaiming implied warranties. *See* 15 U.S.C. § 2308(a)(1). Because this argument was not made to the Seventh Circuit in *Voelker*, that decision arguably is not dispositive on this point.

[17] Even though the *Voelker* court did not expressly find that privity is lacking when the manufacturer provides a written warranty to the consumer, several decisions from this Court arguably presume such a holding. *See, e.g., Snyder v. Komfort Corp*, 2008 WL 2952300 at*5-6 (N.D. Ill. July 30, 2008); *Zaro v. Maserati North America, Inc.*, 2007 WL 4335431 at * 3-4 (N.D. Ill. Dec. 6, 2007). But the Illinois Supreme Court did not rule that consumers not in privity with manufacturers could not bring implied warranty claims. Rather, it held that consumers are in privity with the manufacturer if there are express warranty contracts, as there are here from Summer Infant.

14

### 3. Privity Exists Because Of Summer Infant's Relationship With TRU.

Even if the express warranty provided directly by Summer Infant does not establish privity, Plaintiffs' complaint alleges sufficient facts to permit discovery as to the existence of an agency relationship between Summer Infant as manufacturer and TRU as seller. An agency relationship can establish the privity necessary to assert breach of warranty claims under Magnuson Moss. *See Rothe*, 119 Ill. 2d at 291. In such circumstances, the agent becomes a "seller" for purposes of establishing contractual privity.

To determine agency, courts examine: (1) the manufacturer's relationship with the agent/seller and the consumer; (2) which party received compensation, possessed the goods, and affected the transfer of goods; and (3) which party guaranteed the quality of the goods. *Staco Energy Products Co. v. Driver-Harris Co.*, 578 F. Supp. 700, 703 (S.D. Ohio 1983).

Plaintiffs allege sufficient facts of agency to defeat a motion to dismiss. For example, Plaintiffs allege that the Video Monitors at issue were bought at Babies "R" Us. Some of the monitors were sold on an exclusive basis, and the Babies "R" Us website supported that exclusivity.[18] Also, Summer Infant's website refers customers to Babies "R" Us and links customers to store locations, and the ability to shop at Babies "R" Us online. Plaintiffs have also alleged that the instruction manual directs purchasers to contact Summer Infant with any issues relating to the Video Monitors. Discovery may reveal additional facts to support an agency theory, rendering dismissal on the pleadings inappropriate.

### F. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss must be denied in its entirety.

---

[18] *See Cummings v. Club Mediterranee, S.A.*, 2002 WL 1379128 at *5 (N.D. Ill. June 25, 2002) (exclusive role in marketing and booking sufficient to establish defendant as an agent.)

December 16, 2010                                    Respectfully submitted,

                                                     By: /s/ Nicole Nehama Auerbach
                                                     One of Plaintiffs' Attorneys


Nicole Nehama Auerbach
Henry E. Turner, Jr.
Lisa R. Carter
VALOREM LAW GROUP LLC
35 E. Wacker Dr., Ste. 3000
Chicago, IL 60601
Telephone: 312.676.5460
Fax: 312.676.5499

Aron D. Robinson
The Law Office of Aron D. Robinson
19 S. LaSalle St., Ste. 1200
Chicago, IL 60603
Telephone: 312.857.9050
Fax: 312.857.9054

Lance Raphael
Allison Krumhorn
The Consumer Advocacy Center, PC
180 W. Washington, Ste. 700
Chicago, IL 60602
Telephone: 312.782.5808
Fax: 312.377.9930

## CERTIFICATE OF SERVICE

I certify that a copy of this motion was filed electronically on December 16, 2010. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Henry Turner, Jr.
One of Plaintiff's Attorneys